**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

HAIDDEN EUGENE SHEPARD
*o/b/o CHRISTEL SHEPARD*,

|  |  |
|---|---|
| *Plaintiff*, | CIVIL ACTION NO. 2:17-cv-10197 |
|  | DISTRICT JUDGE GEORGE CARAM STEEH |
|  | MAGISTRATE JUDGE PATRICIA T. MORRIS |

*v.*

COMMISSIONER OF SOCIAL SECURITY,

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 24, 27)

## I.   RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that HES is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiffs' Motion for Summary Judgment, (Doc. 24), be **DENIED**, the Commissioner's Motion, (Doc. 27), be **GRANTED**, and this case be **AFFIRMED**.

## II.   REPORT

### A.   Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Christel Shepard's ("Shepard") claim on behalf of her son, Haidden

1

Eugene Shepard ("HES"), for Supplemental Security Income benefits ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 2). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 24, 27).

On December 12, 2013, Shepard filed an application for SSI grounded on HES's disability, alleging an onset date of September 20, 2011. (Tr. 162-67). The Commissioner denied her claim. (Tr. 93-102). Shepard then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on March 9, 2016 before ALJ Matthew Johnson. (Tr. 41-92). The ALJ issued a decision on June 8, 2016, finding HES not disabled. (Tr. 13-40). On November 18, 2016, the Appeals Council denied review, (Tr. 1-5), and Shepard filed for judicial review of that final decision on January 20, 2017. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker*

*v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not

"try the case de novo, nor resolve conflicts in the evidence, nor decide questions of

credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'"

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than [twelve]
> months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). A child

will be considered disabled if he or she has a "medically determinable physical or mental

impairment, which results in marked and severe functional limitations." 42 U.S.C. §

1382(a)(3)(C)(I).  To determine whether a child's impairment results in marked and severe

limitations, SSA regulations[1] prescribe a three-step sequential evaluation process:

1.    A child will be found "not disabled" if she engages in substantial
      gainful activity.

---

[1] For a history of these regulations, see *Molina v. Barnhart,* No. 00-CIV-9522(DC), 2002 WL 377529
(S.D.N.Y. March 11, 2002).

2.      A child will be found "not disabled" if she does not have a severe impairment or combination of impairments.

3.      A child will be found "disabled" if she has an impairment or combination of impairments that "meets, medically equals, or functionally equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

20 C.F.R. § 416.924(a). In the third step of this analysis—namely, whether a child's impairment(s) functionally equals the listings—the Commissioner assesses the functional limitations caused by the child's impairment(s). 20 C.F.R. § 416.926a(a). To determine functional equivalence, the regulations direct the Commissioner to evaluate how the child functions in six domains, which are "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). These domains are:

1.      Acquiring and using information;

2.      Attending and completing tasks;

3.      Interacting and relating with others;

4.      Moving about and manipulating objects;

5.      Caring for yourself; and

6.      Health and physical well being.

*Id.* If the child's impairments result in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairment functionally equals the listing and the child will be found disabled. 20 C.F.R. § 416.926a(d). A marked limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An extreme limitation is one that "interferes *very* seriously with [a child's] ability to independently initiate, sustain or complete

4

activities." 20 C.F.R. § 416.926a(e)(3)(i) (italics added). "Marked" and "extreme" limitations in a given domain can be established by standardized test scores that are two or three standard deviations, respectively, below the mean – that is, either in the lowest 2.5 percent of the distribution or the lowest 1 percent – provided, however, that the scores are representative of day-to-day functioning. 20 C.F.R. §§ 416.926a(e)(2)(iii), 416.926a(e)(3)(iii). Test scores are not conclusive, therefore, and the bulk of 20 C.F.R. § 416.926a is devoted to "general descriptions of each domain" against which a claimant's functioning may be compared.

### D.    ALJ Findings

Following the three-step sequential analysis, the ALJ found HES not disabled. (Tr. 13-40). At Step One, the ALJ found that HES had not engaged in substantial gainful activity since his alleged onset date of December 12, 2013. (Tr. 20). At Step Two, the ALJ concluded that the following impairments qualified as severe: attention deficit hyperactivity disorder, learning disability/dyslexia, and sensory disorder. (Tr. 20-21). The ALJ also decided, however, that none of these met or functionally equaled a listed impairment at Step Three. (Tr. 21-22). Specifically, the ALJ found that HES had: (a) less than marked limitation in acquiring and using information; (b) marked limitation in attending and completing tasks; (c) less than marked limitation in interacting and relating with others; (d) no limitation in moving about and manipulating objects; (e) less than marked limitation in ability to care for himself; and (f) no limitation in health and physical well-being.

### E.     Administrative Record

#### 1.     Medical Evidence

The Court has reviewed HES's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.     Application Reports and Administrative Hearing

##### i.     HES's Activities of Daily Living

According to Shepard, she woke HES at 7:00 AM each morning and helped him through his morning schedule; each activity was accompanied by visuals to assist him in remembering what to do. (Tr. 186). She then would drive him to school. (*Id.*). After school ended, she would pick him up and direct him through various activities at home "to fulfill his sensory needs." (*Id.*). He ate dinner independently at 5:30 PM, and thereafter Shepard guided him through various "night time" activities, such as taking a bath, brushing his teeth, and getting his pajamas on. (*Id.*).

When not in school, HES engaged in a number of activities such as watching television for approximately an hour, playing video games for an hour or two, riding his bike for up to twenty minutes, coloring for about fifteen minutes, and building Lego models for an hour. (Tr. 185). He had two friends—one eight years old and the other nine years old—with whom he played well; nevertheless, he "has to be supervised" because "he can get overstimulated and become aggressive, . . ." (*Id.*). He behaved himself around adults, but had "difficulty following directions" or staying on task. (*Id.*). On occasion, Shepard said HES had injured other children, himself, and animals. (*Id.*). He received special

education "in the subjects of language arts, mathematics, and handwriting," and received sensory breaks outside the classroom every hour or two for approximately ten minutes. (*Id.*). At the time of writing, Shepard noted HES had missed numerous days of school "due to illness and injuries." (Tr. 187).

HES helped assist with chores, and remained capable of putting toys away, taking out the trash, getting the mail, and feeding his pet rabbit. (*Id.*). Nevertheless, "repeated verbal directions" were required. (*Id.*). "[U]sing too much force while doing chores is a constant battle, part of his sensory processing disorder." (*Id.*). His speech remained intelligible to both those acquainted with him and those not so acquainted. (*Id.*).

### ii.      Shepard's Testimony at the Administrative Hearing

Counsel for Plaintiffs ("Counsel") opened the hearing by noting HES was "11 years of age" and "suffers from sensory processing disorder and a learning disability or dyslexia." (Tr. 44). According to Plaintiffs, HES "suffers from marked inattention, marked impulsivity or impulsiveness, a marked hyperactivity, and his marked impairment in age appropriate social functioning." (Tr. 45). Despite numerous accommodations, HES remained at a first-grade reading level. (*Id.*). "He certainly is an intelligent young boy. The problem is putting that intelligence to use." (*Id.*). "He can't stay focused, he can't concentrate, he is inattentive." (Tr. 46). Shepard then noted that HES "is two years older than his peers" and was "held back one year [in third grade] and . . . started later." (Tr. 48).

Asked when Shepard began to detect HES's conditions, she indicated "[h]e has always had high amounts of energy since he was an infant. He was very hyper active. . . . He would just run from one thing to the next. It was really hard to keep his attention. I had

to kind of keep him engaged in things." (Tr. 49). She suspected his dyslexia due to his "severe lack of reading skills" and the fact that "he reverses his numbers, has a hard time remembering dates and times and things that people say." (Tr. 49). "He had a difficult time following directions and understanding what people were asking of him, expectations were unclear to him, even though people thought they were making it clear. He struggled in that part of linguistics [sic] speech." (Tr. 50). He also would frequently have "melt downs" in the mornings "because they have so many sensory things going on" and they would overwhelm him. (Tr. 51). Shepard initially discovered that using pictures to communicate necessary morning tasks eclipsed the usefulness of spoken word for him. (Tr. 51). Over time, though, Shepard found that the picture system "makes [HES] feel inadequate. . . ." (Tr. 52). Instead, "I have everything . . . organized into bins, so it is a visual reminder, just like the pictures, but it is a kind of hidden visual reminder so he doesn't feel inadequate." (*Id.*). The ALJ wondered how Shepard responded to HES's meltdowns, and she explained "[i]f he is in the melt down I let him have the melt down and then when after he has calmed down then he is much more able to listen and to focus on what I am saying and understand what needs to be done." (Tr. 54). The school, too, understood "that it is normal for him to have shut downs and melt downs especially if the environment is too over stimulating, if they are asking a lot academically, because of his learning disability, . . ." (Tr. 54). At school, HES was provided sensory breaks "for 10 to 15 minutes every two hours with an aide to get his sensory diet completed and he also sees occupational therapists." (Tr. 55). He saw a social worker for "30 to 60 minutes twice a month" as well. (Tr. 56). Thus, he

remained in class about half of each day, and on occasion, anxiety would accompany his classroom time. (Tr. 58).

Shepard noted that HES has friends, but that "interaction with [them] mainly consists of kind of like rough housing. You know, pushing. . . . He has a hard time maintaining substance in relationships, because he lacks many social skills that we work on in a daily basis and because he is unable to pay attention to every little aspect. . . . He does things that maybe [sic] conceived as rude." (Tr. 59). She indicated he also did not understand "social cues," and enjoyed very little special awareness. (Tr. 60, 62). "[H]e is so hyper active and is unable to control his body that that is where you see the reports of the aggression and because of his sensory processing disorder, he has a dysfunction in his properly acceptive [sic] and that is where . . . normally your body is in space. So, he is often, you know, running into the person, running into a wall, constantly touching people, leaning on people, and it is something that his brain says, hey, I need this sensory input." (Tr. 62). He remained able to focus on thirty-minute television shows and video games. (Tr. 63-64). He struggled demonstrating empathy. (Tr. 75).

HES enjoyed athletic activities such as swimming, tubing, playing basketball, and riding a scooter. (Tr. 65). For safety reasons, however, Shepard did not allow HES outside alone. (Tr. 66). He could begin tasks, but had trouble remembering to finish them. (Tr. 78-79). But aside from these memory and hyperactive issues, HES had "fine motor skills," and could accomplish tasks such as brushing his teeth and dressing himself. (Tr. 67).

At times, the ALJ warned plaintiffs' counsel that his questions were duplicative, vague, or otherwise improper. (Tr. 76-77, 80).

### iii.       Dr. Heinemann's Testimony at the Administrative Hearing

At the outset, Dr. Heinemann identified HES's condition as "attention deficit, hyper activity disorder" to be evaluated under Listing 112.11, as well as "a learning disability" characterized by "a sensory integrating, processing deficit," to be considered under Listing 112.02. (Tr. 69). He then opined that HES's conditions, while severe, did not meet or functionally equal the applicable listings. He noted, for instance, that Exhibit 10F showed that HES's school accommodated his limitations well, and that HES appeared capable (albeit inhibited) of functioning above the level required to meet the listings at issue. (Tr. 69-71). As to acquiring and using information, Dr. Heinemann predicted a less than marked limitation because HES "does have areas in which he excels," such as science. (Tr. 71). Citing Exhibit 4E, he noted HES "has generally improved with time as he receives counseling from a social worker." (Tr. 72). Moving forward, he ranked HES's ability to interact or relate with others, to manipulate objects, and to care for himself, as less than marked because, despite several documented "disciplinary actions," the record did not show behavior "ris[ing] to the level of being marked in terms of severity." (*Id.*).

After further questioning of Shepard, Dr. Heinemann remarked that her elaboration on HES's difficulties appeared to "carr[y] over into the social arena in terms of the impulsivity and the inattention to others" but did not "rise to the marked level." (Tr. 82). Shepard's counsel then reviewed numerous test scores featuring poor performance from HES—which Dr. Heinemann accurately identified as "page nine of her psychological report on his complications for children of learning disabilities," (Tr. 83)—and asked whether such scores would translate to "mild, moderate, or severe" impulsivity, (Tr. 84).

The ALJ noted that Dr. Heinemann already spoke to the subject of counsel's question. (*Id.*). Counsel then continued to ask what parts of the listing (in reference to functional equivalence to Listing 112.11) were not marked and why, to which Dr. Heinemann clarified: "You are asking and relating less than marked with regard to relating, no problems, caring for selves, no problems, health and well being, no problems." (Tr. 86). Frustrated, counsel then asked "What would he need to do that he doesn't do to meet the marked listing?" (*Id.*). The ALJ interjected: "I mean, there is 1,000 different scenarios. He doesn't make guesses on what he needs to make. He is going with what is in the medical record. . . . It is not appropriate [for] a doctor to get into pick 3,000 things that could happen there." (Tr. 86-87). Counsel protested: "I'm supposed to be given free access in cross examining this witness." (Tr. 87). The ALJ countered: "It is our witness, because this is not a proceeding governed by adversarial proceedings and stiffened by the rules of evidence. . . . I am not going to allow you to ask the question, because the answer isn't in the medical record." (Tr. 88). Obstinate, counsel replied: "I am trying to ask what would constitute a marked impairment in social functioning. What is not in this case? How is it that he arrives at the conclusion that it is less than marked and if so, tell me what is lacking in this picture? The decryptions [sic] are replete throughout the records, from his teachers, from his mother, from the psychologists who have seen him regarding his lack of social functioning, his lack of concentration, his []lack of persistence and pace." (Tr. 89). The ALJ again challenged counsel to point to specific facts, which counsel refused to do. (*Id.*).

Following this whoop-de-doo, counsel inquired into Dr. Heinemann's psychology practice. (Tr. 91). Dr. Heinemann noted he frequently acted as a witness in social security cases, and that providing such testimony supplied "one quarter" of his workload. (*Id.*).

## F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both    "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

13

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186,

14

at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Plaintiffs furnish five discrete arguments in their Motion for Summary Judgment: (1) the "great weight of evidence" supports a finding that HES meets or functionally equals Listings 112.11 and 112.02, (Doc. 24 at ID 1048-55); (2) the ALJ failed to afford Shepard and HES due process by disallowing proper lines of inquiry into Dr. Heinemann's testimony, (*Id.* at ID 1055-58); (3) the ALJ should not have relied on Dr. Heinemann's testimony in light of his inadequate qualifications as a witness, (*Id.* at ID 1058-63); (4) the ALJ rendered an untenable credibility analysis, (*Id.* at ID 1063-65); and (5) new and

material evidence warrants remand under Sentence Six of 42 U.S.C. § 405(g), (*Id.* at ID 1064-75). I address each argument in turn.

### 1.   Listings 112.11 and 112.02[2]

Plaintiffs' first argument is essentially a cherry-picking argument, insofar as they question the manner by which the ALJ evaluated the sources at issue in reaching the conclusion that HES did not meet or functionally equal Listing 112.11 or Listing 112.02. At the outset, they contend the ALJ "inexplicably fail[ed]" to address Listing 112.11 or Listing 112.02 in his opinion. (Doc. 24 at ID 1052). Additionally, they suggest the ALJ mischaracterized numerous items in evidence, plucking from various exhibits only facts conducive to a finding of not disabled. *See* (*Id.* at ID 1051) (regarding notes written by Ms. Jennifer Mikek, one of HES's teachers: "[HES's] intelligence and likeability do not in any rational way address whether or not he lacks focus, concentration, attention, the capacity to remain on task, or the capacity to avoid distractions"); (*Id.* at ID 1052) (regarding Dr. Garner's and Dr. Heinemann's opinions: "neither of [them] ever met or examined [HES]" and they "ignored" numerous facts in their assessment);[3] (*Id.* at ID 1053) (regarding Dr.

---

[2] On January 17, 2017, Listing 112.11 was amended to cover "Neurodevelopmental Disorders." Because this Listing was not applicable at the time of the hearing or when the ALJ rendered his decision, and because Plaintiffs do not appear to suggest that HES meets this new Listing, I exclusively consider the previously-applicable version.

[3] Although Plaintiffs include a fairly expansive discussion of evidence in their brief, they do not exactly challenge any particular weight assignment—*i.e.*, the weight assigned to Dr. Garner or Dr. Heinemann—in a manner unrelated to Dr. Heinemann's qualifications or bias. To the extent Plaintiffs sought to make an argument that Dr. Heinemann or Dr. Garner, specifically, arrived at unfounded conclusions, it is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waive. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'" (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995))). Notwithstanding this waiver, the discussions that follow address the issue.

Noel's notes: "[t]he fact that [HES] scored well on IQ testing but awful on achievement testing, means that [HES] is much like a high-powered sports car with a broken transmission"); (*Id.*) (regarding Dr. Dennis's examination: "[a]ll the ALJ gleans from [her] lengthy report is that [HES's] IQ scores were in the normal range . . . while ignoring the rest of her neuropsych [sic] assessment"); (*Id.* at ID 1054) (regarding HES's test scores: "raw intelligence, charm and likability *do nothing* to change [the] stark reality" that his "achievement scores are severely deficient across the board"); (*Id.* at ID 1055) (regarding evidence of HES's misbehavior at school: "[t]he ALJ then ignored [HES's] multiple time-outs and in-school suspensions . . . even though this evidenced his marked impairments in interacting and relating with others"). In sum, Plaintiffs posit the ALJ "selectively glean[ed] the evidence with an eye to deny[ing] the claim. . . . and his doing so, again and again is evidence of a failure to provide [HES] a fair trial, as is his statutory right, and due process of law, as is his constitutional right." (*Id.* at ID 1054).

As an initial matter, the ALJ expressly addressed Listing 112.11 and found that HES did not satisfy its requirements because his "impulsiveness and hyperactivity are less than marked." (Tr. 21). Listing 112.11 requires a claimant meet the following criteria, as set forth in paragraphs A and B:

A. Medically documented findings of all three of the following:

1. Marked inattention; and

2. Marked impulsiveness; and

3. Marked hyperactivity;

AND

B. . . . . [R]esulting in at least two of the appropriate age-group criteria in

18

paragraph B2 of 112.02.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 112.11. The material cross-referenced in paragraph B reads as follows:

a. Marked impairment in age-appropriate cognitive/communicative function . . . or

b. Marked impairment in age-appropriate social functioning . . . or

c. Marked impairment in age-appropriate personal functioning . . . or

d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 112.02. To satisfy Listing 112.02, a claimant also must meet the above-listed paragraph B criteria. *Id.*

In assessing whether HES met Listing 112.11, the ALJ relied heavily on opinions from Dr. Heinemann and Dr. Garner, which he found "consistent with the great weight and totality of the evidence"—a finding I determine consistent with substantial evidence in the next section. (Tr. 21). He also cited Dr. Smith's play therapy records for the proposition that HES "was steadily achieving success addressing hyperactivity and inattention concerns," and thoroughly discussed an evaluation from Ms. Mikek, observing that it supported "marked inattention" but not "marked impulsivity or hyperactivity." (Tr. 22); *see* (Tr. 306-07) (making progress towards impulsivity and hyperactivity); (Tr. 193) ("The main problem this child has is paying attention. Once he focuses he has very little trouble learning anything."); (Tr. 232, 254-57, 279-80, 466-67) (demonstrating academic improvement between 2015 and 2016). Ultimately, a claimant holds the burden to demonstrate she meets a listing. *Accord, e.g.*, *Dakroub v. Comm'r of Soc. Sec.*, No. 15-12484, 2016 WL 5539760, at *9 (E.D. Mich. Aug. 1, 2016), *report and recommendation*

*adopted,* No. 15-12484, 2016 WL 5405325 (E.D. Mich. Sept. 28, 2016) (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). The ALJ's determination that Plaintiffs failed to meet this burden as to paragraph A of Listing 112.11 was supported by substantial evidence. *Cf. Wilson v. Colvin*, No. 3:13-CV-710-TAV-HBG, 2015 WL 1396736, at *3 (E.D. Tenn. Mar. 26, 2015) ("[T]he Sixth Circuit has declined to require remand whenever an ALJ provides minimal reasoning at step three of the five-step inquiry.").

After determining that HES did not meet Listing 112.11, he thoroughly engaged the evidence as to the six components relevant to functional equivalence—that is, (i) acquiring and using information, (ii) attending and completing tasks, (iii) interacting with others, (iv) moving about and manipulating objects, (v) caring for oneself, and (vi) health and physical well-being—and found HES also did not functionally equal Listing 112.11. (Tr. 22-35). He found marked limitation in attending and completing tasks, but less than marked or no limitation in the other categories.

In acquiring and using information, the ALJ noted that despite academic faltering between 2012 and 2014, HES "surpassed his end-of-year academic goals in reading and was above benchmarks in mathematics and general science . . . ." in the winter of 2015 to 2016. (Tr. 26); *see* (Tr. 232, 254-57, 279-80, 466-67). Testing revealed an average IQ. (Tr. 25-26, 726). Despite Shepard's testimony that HES "struggled with linguistic speech and clarity," she also indicated in the record that HES's speech was intelligible "most of the time." (Tr. 26); *see* (Tr. 187). The ALJ remained careful to note evidence tending to prove some impairment in this area, including opinions from Dr. Garner and Heinemann that

20

HES suffered a learning disability, alongside his struggles reading and writing over the years. (Tr. 25-26). He arrived at his conclusion that HES suffered less than marked limitation in acquiring and using information after considering the entire record, and it is supported by substantial evidence.

As to interacting and relating with others, the ALJ invoked myriad positive reports about HES's skills in this domain—as well as his participation in classroom and athletic activities—as evidence he suffered less than marked limitation in this domain. (Tr. 30-31); *see* (Tr. 195) (indicating HES suffered no problems interacting and relating with others); (Tr. 481, 491, 501) (swimming and playing football); (Tr. 466-67, 751) (participating in the classroom); *see also* (96, 195, 199, 279-80, 306, 317, 320, 383, 389, 405, 429, 433-34, 447, 466-67, 478, 482, 485, 496, 505, 508-09, 512, 514, 520, 525, 532, 536, 540, 570, 572, 586, 589, 591, 603, 614, 618, 629, 640, 671, 683, 687, 691, 713, 716, 725-26, 729, 772, 774, 799, 816) (demonstrating appropriate behavior and/or social acuity). Substantial evidence bolsters this finding as well.

The ALJ next found HES demonstrated no limitations moving about and manipulating objects, citing Shepard's testimony, HES's daily activities, and Ms. Mikek's observations, alongside opinions from Dr. Garner and Dr. Heinemann. (Tr. 32); *see* (Tr. 96, 196). He cited the same sources, and similar evidence, in finding that HES had less than marked limitation in caring for himself, and no limitation in health and well-being. (Tr. 34); *see* (Tr. 97, 185-87, 197-98). Like the findings before them, substantial evidence bolsters these findings.

Admittedly, the ALJ does not explicitly discuss Listing 112.02 in his opinion. Nevertheless, questions he posed in the hearing to Dr. Heinemann and Shepard—as well as his discussion of Dr. Garner's and Dr. Heinemann's opinions—suggest he considered the relevant paragraph B criteria in his determination. *E.g.*, (Tr. 85-86) ("[J]ust to clarify, [HES] does not . . . meet or equal 1[]12.11 or 1[]11.2 and does not functionally equal either of those listings because only one of those functional domains is marked, . . ."); *see also, e.g.*, (Tr. 97); (Tr. 21-35) (assigning Dr. Garner and Dr. Heinemann great weight for many categories of consideration). The ALJ's findings as to functional equivalence—*i.e.*, no limitations in 'moving about and manipulating objects' or 'health and well-being,' as well as less than marked limitation in 'acquiring and using information,' 'interacting and relating with others,' and 'caring for himself'—essentially preclude a finding that HES meets Listing 112.02. *See M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 861 (E.D. Mich. 2012) ("[A]n error [as to Step Three] is harmless only when 'concrete factual and medical evidence' is 'apparent in the record' and shows that even if the ALJ had made the required findings, the ALJ *would have* found the claimant not disabled." (quoting *Juarez v. Astrue*, No. 2:09-cv-160, 2010 WL 743739, at *5-6 (E.D. Tenn. Mar. 1, 2010))). Moreover, Plaintiffs fail to offer a convincing evidentiary argument that remand would produce a different outcome as to this listing. Taken together, these factors render the ALJ's error in failing to directly address Listing 112.02 harmless. *E.g.*, *Davis v. Comm'r of Soc. Sec.*, No. 13-13319, 2015 WL 668035, at *2 (E.D. Mich. Feb. 17, 2015) ("Given this lack of evidence that Plaintiff's cognitive impairment meets an essential element of the Listing, there is no prospect that a remand to the Defendant Commissioner could produce

a different outcome, and it follows that any error in the ALJ's step three inquiry was harmless.").

Taken together, these elements of the ALJ's discussion translate into a composite rationale supported by substantial evidence. Put another way, "we see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). The Court should reject Plaintiffs' argument on these grounds.

### 2.    Due Process

Plaintiffs next levy the following heavy-handed rebuke against the ALJ's impartiality:

> In the instant case a reasonable person, knowing all of the surrounding circumstances, including the overwhelming evidence of record of [HES's] severe mental impairments, and the ALJ's taking evidence out of context and according great weight to the opinions of non-examiners when treaters and examiners uniformly had findings contrary to those of the non-examiners, could only come to the conclusion that ALJ Johnson is neither impartial, nor fair, nor just, and that a hearing before him, constitutes an impermissible denial of 'equal protection under the law' and 'due process of law' guaranteed [HES] by the Fifth and Fourteenth Amendments to the United States Constitution.

(Doc. 24 at ID 1056). Two distinct reasons underlie this diatribe: (i) the ALJ accorded great weight to Dr. Heinemann over other more favorable sources, and (ii) the ALJ did not allow Plaintiffs to "present [their] case in an unfettered manner." (Doc. 24 at ID 1058). In effect, Plaintiffs posit these factors deprived them of due process of law.

I decline to delve into the former reason here, for I offer a more nuanced discussion in the following section. At this juncture, I simply note that assigning a claimant's non-

23

examining source like Dr. Heinemann more weight than examining or treating sources—

or, for that matter, reaching any conclusion adverse to a claimant—does not imply any bias

or deprivation of due process against that claimant. *Accord, e.g.*, *Perschka v. Comm'r of*

*Soc. Sec.*, 411 F. App'x 781, 788 (6th Cir. 2010) ("Perschka presents no evidence to

substantiate her claim that the ALJ was biased, other than the ALJ's unfavorable ruling.

An adverse ruling alone is not enough to support a finding of bias."). And as discussed

above, the ALJ's rationale did not contravene "the overwhelming evidence of record" or

"tak[e] evidence out of context," as Plaintiffs suppose. (Doc. 24 at ID 1056).

Plaintiffs' complaint that the ALJ hamstrung Counsel's ability to present their case

similarly lacks merit. In this Circuit, courts assume individuals seeking Social Security

benefits have "a property interest in those benefits protected by the Fifth Amendment."

*Ferriell v. Comm'r of Soc. Sec.*, 614 F.3d 611, 620 (6th Cir. 2010) (citing *Richardson v.*

*Perales*, 402 U.S. 389, 401-02 (1971)). When evaluating such due process claims, the

Supreme Court's *Mathews v. Eldridge* test is instructive:

> First, the private interest that will be affected by the official action; second,
> the risk of an erroneous deprivation of such interest through the procedures
> used, and the probably value, if any, of additional or substitute procedural
> safeguards; and finally, the Government's interest, including the function
> involved and the fiscal and administrative burdens that the additional or
> substitute procedural requirement would entail.

424 U.S. 319, 335 (1976); *Ferriell*, 614 F.3d at 620 ("To determine whether [a social

security] hearing passes constitutional muster, a court must look to the three factors

identified by the Supreme Court in *Mathews v. Eldridge*, . . ."); *accord, e.g.*, *Hicks v.*

*Colvin*, 214 F. Supp. 3d 627, 641 (E.D. Ky. 2016), *order corrected sub nom. Hicks v.*

*Berryhill*, No. CV 16-154-ART, 2017 WL 1227929 (E.D. Ky. Mar. 31, 2017) ("[C]ourts

normally use [the *Mathews* test] to measure how much process is due . . . .").

 As the Sixth Circuit has observed, "[d]ue process requires that a social security

hearing be 'full and fair.'" *Flatford v. Chater*, 93 F.3d 1296, 1305 (6th Cir. 1996).

Plaintiffs' interest in a full and fair determination—*i.e.*, the private interest affected by the

official action—is a "fair determination of [HES's] qualification (or lack thereof) for social

security disability benefits and a meaningful opportunity to present his case." *Id.* at 1306.

In *Flatford*, which confronted a somewhat analogous situation, the ALJ had declined in his

discretion to issue a subpoena requested by the plaintiff. *Id.* at 1307. By contrast, Plaintiffs

here had an opportunity to cross-examine Dr. Heinemann and to testify, but that

opportunity was not "unfettered," which Plaintiffs suggest evidences a denial of due

process. (Doc. 24 at ID 1058). As the court in *Flatford* observed, however, "an absolute

right to cross-examination is not required in the social security disability benefits cases for

the development of a complete record." *Id.* at 1307. Indeed, the court found that "absent a

showing of bias, we do not believe that the [ALJ's] decision to deny a subpoena to Flatford

was an abuse of his discretion." *Id.* To prevail in their argument, therefore, Plaintiffs must

offer "convincing evidence that 'a risk of actual bias or prejudgment' [was] present."

*Collier v. Comm'r of Soc. Sec.*, 108 F. App'x 358, 363-64 (6th Cir. 20014) (quoting

*Schweiker v. McClure*, 456 U.S. 188, 196 (1982)); *see Sturgeon v. Comm'r of Soc. Sec.*,

No. 1:12-CV-833, 2013 WL 6632635, at *5 (S.D. Ohio Dec. 17, 2013), *report and

recommendation adopted,* No. 1:12-CV-833, 2014 WL 617640 (S.D. Ohio Feb. 18, 2014)

("Bias on the part of the decisionmaker must be apparent from the record and 'cannot be

based on speculation or inference.'" (quoting *Carelli v. Comm'r of Soc. Sec.*, 390 F. App'x

429, 436 (6th Cir. 2010))). If bias motivated the ALJ in limiting Plaintiffs' ability to cross-

examine Dr. Heinemann and testify, then the risk of erroneously depriving Plaintiffs of

their interest would likely have been high.

Plaintiffs cannot, however, prove that such bias existed. At the outset, there exists a

presumption that the ALJ was not biased; Plaintiffs shoulder the burden of demonstrating

"either some conflict of interest or other specific reason for disqualification." *Thornton v.*

*Barnhart*, No. CIV.A. 505CV00055, 2006 WL 759672, at *10 (W.D. Va. Mar. 21, 2006)

(citing *Gibson v. Berryhill*, 411 U.S. 564, 578-79 (1973)); *see Withrow v. Larkin*, 421 U.S.

35, 47 (1975). The transcript of the hearing at issue shows the ALJ did hamper Plaintiffs'

counsel's questioning at times, (Tr. 76-77, 80, 84-91), but that he did so to prevent the

solicitation of duplicative or speculative testimony, a course of conduct he defended in his

written decision: "Rather than asking clear and probative questions of Dr. Heinemann, the

claimant's representative asked vague and open-ended questions, without true foundation

in the medical evidence of record, the school records, or third-party statements/testimony.

. . . [T]here must be some foundation and nexus for any lines of questioning," (Tr. 17).

Despite Plaintiffs' lamentations, the record corroborates the ALJ's view on this

matter. To illustrate why requires but a glance at the pertinent colloquies. *See, e.g.*, (Tr. 76-

77) (cutting off a question "because we heard [Shepard] talk about it" already); (Tr. 86)

(disallowing the question "What would he need to do that he doesn't do to meet the marked

listing?" because "there is [sic] 1,000 different scenarios. . . . It is not appropriate [for] a

doctor to get into pick 3,000 things that could happen there. If you have something you

26

want to point to him in the medical record, then ask[] him if he looked at and then considered that"). In this particular instance, Plaintiff eventually (and reluctantly) pivoted from his speculative question and (confirming the ALJ's suspicions) revealed its nature as merely a rhetorical device—"I am trying to ask a different question. . . . How is it that [Dr. Heinemann] arrives at the conclusion that [HES's limitations are] less than marked, and if so, tell me what is lacking in this picture? The decryptions [sic] are replete throughout the records, from his teachers, from his mother, from the psychologists who have seen him regarding his lack of social functioning, his lack of concentration, his []lack of persistence and pace," (Tr. 88-89). Where Plaintiffs posed legitimate questions, the ALJ uniformly allowed them. *E.g.*, (Tr. 80) (initially barring repeated inquiry into HES's homework habits, but reversing course because Plaintiffs clarified the relevance and novelty of the question). In other words, the ALJ imposed commonsense limitations on the range of questions Plaintiff could ask; he did not heighten the risk of an erroneous deprivation of benefits in doing so. *Cf. McLaughlin v. Sec'y of Health, Ed. & Welfare of U.S.*, 612 F.2d 701, 703 (2d Cir. 1980) (remanding because the ALJ disallowed inquiry into an area he acknowledged was "'important'"); *Bondy v. Comm'r of Soc. Sec.*, No. 13-CV-14537, 2015 WL 1530435, at *3 (E.D. Mich. Mar. 31, 2015) ("While Bondy had a right to cross-examine the VE, claimants do not have carte blanche to ask redundant or futile questions. And ALJs in a hearing, much like a judge in a court, should be able to limit testimony to what is relevant and not redundant."); *Mireles ex rel. S.M.M. v. Comm'r of Soc. Sec.*, No. 1:13-CV-699, 2014 WL 4854426, at *5 (W.D. Mich. Sept. 29, 2014), *aff'd*, 608 F. App'x 397 (6th Cir. 2015) ("The ALJ intervened in the questioning only when counsel attempted

27

to ask questions which went beyond the scope of the ME's involvement. Counsel had an opportunity to pursue other lines of questioning, but declined.").

Superfluous questions are not probative as to the existence of disability or the witness's credibility, and the Commissioner has a strong interest in precluding them. *Cf. Bryant v. Colvin*, No. 4:13CV16 HEA, 2014 WL 636360, at *4 (E.D. Mo. Feb. 18, 2014) (rejecting the argument that an "unusually short" hearing, in which the ALJ interrupted questioning "several times" and advised counsel to "'wrap it up,'" demonstrated ALJ bias); *Jensen v. Cty. of Sonoma*, No. C-08-3440 JCS, 2010 WL 2330384, at *15 (N.D. Cal. June 4, 2010), *aff'd* 444 F. App'x 156 (9th Cir. 2011) ("Plaintiffs' arguments amount to a claim that the hearing was not conducted exactly as he would have conducted it."); *McCluskey v. Barnhart*, No. C-00-04855 VRW, 2002 WL 500809, at *5 (N.D. Cal. Mar. 29, 2002) ("Plaintiff has not pointed to any conflict of interest or other specific reason for disqualification. . . . Having reviewed the transcript of the hearing, the court does not find evidence of behavior so extreme as to display a clear inability to render fair judgment."). The record at issue does not show ALJ bias against Plaintiffs, and consequently, fails to establish any due process violation. The Court should reject Plaintiffs' argument on this front.

### 3.    The Weight Accorded Dr. Heinemann's Opinion

Plaintiffs' third argument suggests Dr. Heinemann should have been given "little or no weight" because: (i) he lacked expertise "in the field of child psychology"; (ii) he received "significant monetary contribution" from the SSA; (iii) he could not "point to specific instances in the evidence to support his unfounded conclusions"; (iv) the ALJ

repeatedly interfered with counsel's cross-examination of him; and (v) counsel "timely" objected to him as a witness. (Doc. 24 at ID 1058). I dealt with Plaintiffs' fourth alleged reason above, finding it unsupported, and will discuss the remaining allegations in the order listed.

To attack Dr. Heinemann's expertise and impartiality at this stage is perplexing, as Plaintiffs declined to object to his qualifications before the hearing and stipulated to his adequacy to testify as a medical expert at the hearing. (Tr. 16, 68, 151, 559). Plaintiffs suppose their objection to the utilization of Dr. Heinemann was timely, even though it occurred after their stipulation to his credentials at the hearing. (Tr. 264-67). As the ALJ noted, "just because a claimant does not like the testimony or the conclusions reached by a medical expert that does not mean that he can subsequently challenge said medical expert's qualifications and, in effect, attempt to renege on his hearing stipulation." (Tr. 16). To this, Plaintiffs argue that "the stated Qualifications were inaccurate and failed to reveal the fact that Dr. Heinemann was a professor of PMR, not of psychology that he had not practiced in the field of child psychology with the exception of spinal cord injury victims in over 20 year, [sic] if ever." (Doc. 24 at ID 1059 n.4). The facts Plaintiffs highlight are not, however, inaccuracies—they are omissions. The form itself was accurate, albeit sparse. (Tr. 559). Had Plaintiffs inquired further into Dr. Heinemann's credentials before stipulating to his fitness to testify, they might have preserved this objection properly. As it stands, however, Plaintiffs waived any opportunity to object to Dr. Heinemann's capacity to testify as a medical witness in this case by failing to raise it at the hearing. *Accord, e.g.*, *Lemle v. Comm'r of Soc. Sec.*, No. Civ.A. 11-10295, 20122 WL 1060111, at *7 (E.D. Mich.

Jan. 27, 2012), *report and recommendation adopted,* No. 11-10295, 2012 WL 1059787 (E.D. Mich. Mar. 29, 2012) ("[I]f Plaintiff wanted to challenge the credentials of the expert witnesses, she should have done so during the administrative hearing."); *Lewis v. Astrue*, No. EDCV07-412-MAN, 2008 WL 4394049, at *3 (C.D. Cal. Aug. 29, 2008) ("At the hearing, plaintiff, through his attorney, had the opportunity to object to the medical expert's qualifications, but he chose not to do so. . . . 'If a party fails to object to an expert's qualifications at the hearing, he waives the right to challenge them.'" (quoting *Ischay v. Barnhart*, 383 F.Supp.2d 1199, 1222 n.16 (C.D. Cal. 2005))). Nor does receipt of payment from the Social Security Agency raise a specter of bias; Plaintiffs furnish no authority for the proposition that it does. *Accord Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 922 (6th Cir. 2011) ("Massey . . . cites no authority holding a medical expert who is an employee of the [SSA] ineligible to serve as an expert witness at a disability evidentiary hearing."). Accordingly, the first, second, and fifth reasons Plaintiffs advance against Dr. Heinemann should be discarded.

The third reason—that Dr. Heinemann failed to cite the record in giving his opinion—also disagrees with the transcript of the hearing. At numerous points, Dr. Heinemann cited specific portions of the record for support in his testimony. (Tr. 69-72, 83-84). He even cited a specific page of a medical exhibit when giving an answer. (Tr. 83). As a riposte to this fact, Plaintiffs aver "[Dr. Heinemann] has no professional experience in the care and treatment of children suffering from [HES's] impairments," and yet the ALJ granted him more weight than "the true experts" in child psychology. (Doc. 24 at ID 1059). Again, this is not entirely true for reasons discussed above, namely the other substantial

evidence the ALJ consulted in coming to his conclusions. (Tr. 21-35). Even if it were true, an expert need not be a specialist in order to supply valuable testimony as to disability. *See Davis v. Chater*, 104 F.3d 361, at *2 (6th Cir. Dec. 19, 1996) (unpublished table decision) ("[T]he ALJ's failure to call a medical expert trained in a particular specialty does not prevent this court from finding that substantial evidence supports the ALJ's decision and there is no indication the ALJ abused his discretion in this matter."); *cf. Dull v. Comm'r of Soc. Sec.*, No. 13-11954, 2014 WL 12573404, at *6 (E.D. Mich. July 21, 2014) (noting that while ALJs must fairly weigh the evidence of record, they are "not *required* to further develop evidence in the record" by soliciting medical expert advice).

In sum, Plaintiffs' rationale for discrediting Dr. Heinemann—when pared down to its bare essentials—rings hollow. The Court should find Plaintiffs' argument similarly unpersuasive.

### 4.    Credibility

Plaintiffs next aver the ALJ wholly failed to evaluate her credibility, resulting in remandable error. Specifically, she says "[t]he ALJ's decision shows no analysis of [her] credibility. None. Without further specificity by the ALJ, this Honorable Court cannot determine whether the ALJ's implicit credibility finding is based on substantial evidence" as the "credibility of [her] statements has significant ramifications." (Doc. 24 at ID 1064). Because her testimony was consistent with "the great weight of the evidence" favoring disability, failure to address her statements is fatal to the legitimacy of the ALJ's findings. (*Id.*).

In child disability cases, "'the ALJ must make specific findings concerning the credibility of the parent's testimony, just as he would if the child were testifying.'" *Phillips v. Comm'r of Soc. Sec.*, No. 4:11-CV-1952, 2013 WL 393023, at *4 (N.D. Ohio Jan. 30, 2013) (quoting *Hickman ex rel. M.A.H. v. Astrue*, 728 F. Supp. 2d 168, 181 (N.D.N.Y. 2010)). Boilerplate or nonexistent credibility analyses are unacceptable because they deprive subsequent reviewers a glimpse into the reason an ALJ did not believe a claimant. Specifically, an ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). Plaintiffs are correct in observing the ALJ did not at any particular point shunt the entirety of Shepard's testimony into a simplistic category of reliability. The ALJ did, however, regularly and repeatedly discuss Shepard's pertinent testimony in conjunction with the rest of the medical evidence. *See generally* (Tr. 25-35) (contrasting Shepard's testimony with other evidence of record). The reasons given for adopting or discounting her statements are evident, plain, and well-reasoned. *See, e.g.*, (Tr. 26) (needling the inconsistency among Shepard's statements regarding HES's ability to verbally communicate); (Tr. 28-29) (crediting Shepard's testimony that HES could not tolerate Ritalin, and that he would fidget while watching television or playing video games); (Tr. 31) (accepting Shepard's testimony that HES did not push a child "in an aggressive manner, or out of anger, but, rather . . . because he was so hyperactive and could not control his body"); (Tr. 32) (noting Shepard's testimony as to HES's athletic lifestyle:

"She denied that her son had any problems manipulating objects"). Ironically, the ALJ appears to have accepted much of Shepard's testimony as credible, and found it consistent with other evidence mandating a *denial* of benefits.[4] Because the ALJ fulfilled his duty to provide specific reasons for his findings as to Shepard's credibility, the ALJ's failure to expressly assign a weight to Shepard's testimony, if error at all, is harmless error. *See Spicer v. Apfel*, 15 F. App'x 227, 234 (6th Cir. 2001) (upholding a decision that did not provide "detailed reasons for [the] credibility determination" because the ALJ adequately discussed the claimant's statements); *Klink v. Comm'r of Soc. Sec.*, No. 12-15172, 2014 WL 902707, at *8 (E.D. Mich. Mar. 7, 2014) ("[A]n ALJ need not explicitly discuss every [credibility] factor . . . ." (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio, 2005))); *cf. Van Buskirk v. Astrue*, No. 2:09-CV-867, 2010 WL 3365929, at *3 (S.D. Ohio Aug. 23, 2010) (remanding because "the ALJ's decision *made no mention* of" the lay evidence of record (emphasis added)).

## 5. Sentence Six

Plaintiffs also move for a Sentence Six remand to consider a variety of additional evidence not present before the ALJ. (Doc. 24 at ID 1065-74). For ease of reference, I provide an itemized list below:

(i)    School Social Work Report by Amanda Hulan, LMSW, dated January 28, 2013;

(ii)   Occupational Therapy Evaluation, dated February 3, 2013;

(iii)  Individualized Education Program, Morey Public School Academy, dated October 10, 2013;

---

[4] Plaintiffs suppose all of Shepard's testimony was consistent with a finding of disability, but they curiously do not cite any evidence for this proposition. *See* (Doc. 24 at ID 1064).

(iv)   Morey Public Schools Progress Report by teacher Ms. Mikek, 2013-2014;

(v)    Morey Public School Discipline Records, 2013-2014;

(vi)   Occupational Therapy Evaluation, dated March 2, 2015;

(vii)  Mt. Pleasant Public Schools Progress Report by teacher Mr. Brian Schafer, 2015-2016;

(viii) Social Skills Improvement Plan, dated June 7, 2016;

(ix)   Report of D.O. Robert Root of Dewitt Pediatrics, dated August 12, 2016;

(x)    Report of OTR Teri Webster, of MidMichigan Health Mount Pleasant Rehab, dated August 31, 2016;

(xi)   Psychological Evaluations by Craig Smith, PhD, dated September 22 and 28, 2016, and October 12, 2016; and

(xii)  Narrative Report by Mr. Smith, dated October 20, 2016.

(Doc. 24, Ex. 1 at ID 1109-88).[5]  Remand under Sentence Six is not appropriate unless the claimant shows: (1) "the evidence at issue is both 'new' and 'material,'" and (2) "there is 'good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Hollon ex. rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)). Evidence is new only if "it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). It is material only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the

---

[5] The exhibit in which these materials appear, attached to their brief, includes an additional thirty-two pages of argumentation. (Doc. 24, Ex. 1 at ID 1077-1108). Although I consider this argumentation, as I considered Plaintiffs' overlong brief, I must admonish Counsel for flouting this Court's instructions. Before submission of the instant brief and Motion, (Doc. 24), Counsel's briefs and motions in support of summary judgment were stricken *twice* for failure to conform to Local Rule 7.1(d)(3)'s mandate that "[t]he text of a brief supporting a motion or response, including footnotes and signatures, may not exceed 25 pages." The second time, this Court specified he was to file "*one* motion and brief for summary judgment, the motion and brief not to exceed 40 pages total," (Doc. 23), and yet Counsel baldly disobeyed this instruction in his next filing, (Doc. 24). To prevent undue delay, and in my discretion, I forgave this trespass and considered the arguments presented. But in the future, Counsel is advised not to play games with his page-numbering and to adhere to the same, universally-applicable page limits and instructions which confine every other party.

disability claim if presented with the new evidence.'" *Id.* (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)). And one shows good cause by "demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Id.* (citing *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (1984) (per curiam)). "It is well established that the party seeking remand bears the burden of showing that a remand is proper under Section 405." *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).

Plaintiffs argue that "some of the proffered evidence is new in the sense that it is new to this matter when proffered, whilst most of it is new in that it did not exist at the time of the hearing." (Doc. 24, Ex. 1 at ID 1065-66). The latter reason comports with the relevant standard, but the former one evades (in tautological fashion) the legal meaning of "new" in the context of a Sentence Six remand. Items (i) through (vi) were in existence before Plaintiffs' hearing before the ALJ, and Plaintiffs offer no indication they were unavailable before the ALJ rendered his decision. Because they are not new, they should not motivate this Court to remand this matter under Sentence Six.

The remaining evidence is new, but not material. Nothing in items (vii) and (viii) is significant enough to change the ALJ's opinion as to HES's social functioning; aside from certain minor inconsistencies, the evidence is largely cumulative and shows no great departure from HES's other struggles in the record. (*Id.* at ID 1164-69); *e.g.*, *Tinpan v. Comm'r of Soc. Sec.*, No. 13-CV-12613, 2014

WL 2883418, at *2 (E.D. Mich. June 25, 2014) (finding evidence which "did not contain any evidence of disabling functional limitations" immaterial). Indeed, item (viii) merely lists a series of scores without accompanying narrative analysis, and thereby lacks persuasive appeal compared to evidence of social functioning the ALJ actually evaluated in the record. *Cf. Ellars v. Comm'r of Soc. Sec.*, No. 15-4039, 2016 WL 2610234, at *2 (6th Cir. 2016) ("[T]he administrative law judge properly gave a check-box form little weight where the physician provided no explanation for the restrictions entered on the form and cited no supporting objective medical evidence."). D.O. Root's report in item (ix) contains diagnoses and statements only opaquely relevant to the severity of HES's conditions. (Doc. 24, Ex. 1 at ID 1171) ("With ADHD, as you know, [HES] struggles with inattention, impulsivity and hyperactivity. . . . [I]nterventions were very helpful last hear"). *See generally Maloney v. Apfel*, 211 F.3d 1269, at *2 (6th Cir. Apr. 14, 2000) (unpublished table decision) ("'The mere diagnosis of [an impairment], of course, says nothing about the severity of the condition.'" (quoting *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988))). Even assuming Ms. Webster's report, or item (x), related back to the relevant disability period, it does not appear to contain information that would translate into marked limitations in areas other than inattention or attending to and completing tasks, which the ALJ already found to be marked. (Doc. 24, Ex. 1 at ID 1172-75). And Dr. Smith's observations—items (xi) and (xii)—present no substantial likelihood of a different outcome on remand, partly because the information therein pertains only to a period post-dating the ALJ's decision. (Doc.

24, Ex. 1 at ID 1176-88); *cf. Hogston v. Comm'r of Soc. Sec.*, No. 14-14458, 2015 WL 4459352, at *3 (E.D. Mich. July 21, 2015) ("Such evidence merely demonstrates only that Plaintiff's condition either developed or worsened after his [date last insured], which is outside of the relevant time period."). To the extent the information therein relates back to the period at issue, it shows "no marked departure from previous examinations" and therefore offers no reasonable probability of a different result on remand. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).

In light of the foregoing analysis, Plaintiffs fail to demonstrate an entitlement to a remand under Sentence Six, and the Court should deny such prayer for relief.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiffs' Motion for Summary Judgment, (Doc. 24), be **DENIED**, the Commissioner's Motion, (Doc. 27), be **GRANTED**, and this case be **AFFIRMED**.

## III. REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States*

*v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 11, 2018           S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

**CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 11, 2018           By s/Kristen Castaneda
Case Manager